Omero Banuelos, SBN 228267
415 W. Foothill Blvd. #202
Claremont, CA 91701
(213) 457-7171

Attorneys for Plaintiff, Thomas M. Reilly

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Thomas M. Reilly | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| APPLE, INC., Does 1 to 10, | |
| Defendants. | |

**COMPLAINT**

Plaintiff, Thomas M. Reilly ("Plaintiff")  for causes of action against defendants, and each of them, allege and complain as follows:

## PARTIES

1.      Plaintiff is, and at all times relevant hereto was, an individual residing in Bedminster, New Jersey.

2.      Plaintiff is informed and believes that defendant APPLE, INC. ("Apple" or "Defendant") is, and at all times relevant hereto was, a corporation and with its headquarters in Cupertino, California. Apple is one of largest public company in the world, with a current market capitalization of close to $2 trillion. Apple designs, markets and sells smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services. More importantly, Apple also owns and operates the Apple App Store (the "Apple Store"), including contracting with all app developers that distribute their apps through the Apple Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

3.      Plaintiff is unaware of the true names, identities and capacities, whether individual, corporate, associate or otherwise of any defendants sued herein as a Doe, and Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

4.      Each of the defendants, including those identified by fictitious names are, and at all times relevant herein, were acting for itself and/or as the agent, servant or employee of each of the co-defendants and is in some way liable and responsible to

2

**COMPLAINT**

Plaintiff on the facts herein alleged and proximately caused injuries and damages to Plaintiff.

5.      Plaintiff is the developer of Konverti, a Peer to Peer Currency Exchange application. ("Konverti").  At its core Konverti facilitates person to person exchanges of small amounts of currency.  These transactions typically involve remnant cash; amounts that someone would need coming into a country or would want to get rid of going out of a country; this is the money one would typically put it a bowl at home at the end of a trip and forget about.  This is very low risk from a cash flow and security perspective.

6.      Each individual is identifiable through their unique Apple ID. Konverti, to Plaintiff's knowledge does not trigger any, security, legal or reporting requirements. The individual's identification is vetted through Apple's identity management system. As such, Konverti users are tracked with their Apple IDs while using Konverti. Konverti was also approved by the Google Play Store and is currently available through Google Play for android system users.

7.      Konverti was approved and placed in the Apple Store in June 2017 and abruptly removed weeks later without clear cause given.  Plaintiff appealed the decision multiple times, most recently in 2020.  Plaintiff received only the following reason verbal reason for the removal:  "We don't feel it's safe". In addition, Apple referenced the following written reason:

**COMPLAINT**

"Guideline 5.0 - Legal

We continue to find your app still facilitates individuals meeting in person for currency exchange, which is not an appropriate concept for the App Store. It would be appropriate to review your app concept and remove all content and features that are illegal in the locations where your app is available."

8.      Plaintiff invested a significant amount of time, effort, expense, and resources into Konverti's development and business plan.  Throughout the time Konverti was being developed in the Apple Developer environment, Plaintiff provided full transparency that Konverti facilitates exchanges of small amounts of cash among international travelers in airports.

9.      Plaintiff client worked with Apple in the development process and at no point during its development did Apple indicate that the Konverti's concept was a violation of a policy or even risked being excluded from the Apple Store.  Based on this our client continued to invest in the development of the application.  Plaintiff invested over $150,000 developing Konverti.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367. The Court also has subject matter jurisdiction over the

state law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of Plaintiff, on one hand, and of Plaintiff, on the other. The amount in controversy exceeds $75,000.

11.   This Court has personal jurisdiction over Apple. Apple is headquartered in this District. Also, Apple has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over Apple would comport with due process requirements.

12.   Further, Apple has consented to the exercise of personal jurisdiction by this Court. Apple is party to an Apple Developer Program License Agreement (the "Developer Agreement") with Plaintiff. Section 14.10 of the Developer Agreement provides that "[a]ny litigation or other dispute resolution" between the parties "arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California", and that the parties "consent to the personal jurisdiction of and exclusive venue in the state and federal courts within" the Northern District of California. Section 14.10 further provides that the Developer Agreement "will be governed by and construed in accordance with the laws of the United States and the State of California". The claims raised in this Complaint "relate to" Plaintiff's relationship with Apple.

13.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Apple maintains its principal place of business in the State of California and in this

**COMPLAINT**

District, and because a substantial part of the events or omissions giving rise to

Plaintiff's claims occurred in this District. In the alternative, personal jurisdiction and

venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15

U.S.C. § 22, because Apple may be found in or transacts business in this District.

## **INTRADISTRICT ASSIGNMENT**

14.     Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be

assigned to a particular Division of this District, but shall be assigned on a District wide

basis.

## **RELEVANT FACTS**

15.     As stated above, Konverti was approved and placed in the Apple Store in

June 2017 and abruptly removed weeks later without clear cause given.  Plaintiff

appealed the decision multiple times, most recently in 2020.  Plaintiff received only the

following reasons for the removal:

1)  "We don't feel it's safe" - verbal only and

2)  "Guideline 5.0 - Legal

   We continue to find your app still facilitates individuals meeting in person for

   currency exchange, which is not an appropriate concept for the App Store. It

   would be appropriate to review your app concept and remove all content and

   features that are illegal in the locations where your app is available."

**COMPLAINT**

16.     Guideline 5.0 does not reference any specific issue regarding personal exchanges or locations where such exchanges are illegal.  The guideline specifically states that:

"Apps must comply with all legal requirements in any location where you make them available (if you're not sure, check with a lawyer). We know this stuff is complicated, but it is your responsibility to understand and make sure your app conforms with all local laws, not just the guidelines below. And of course, apps that solicit, promote, or encourage criminal or clearly reckless behavior will be rejected. In extreme cases, such as apps that are found to facilitate human trafficking and/or the exploitation of children, appropriate authorities will be notified."

Plaintiff made multiple requests to Apple to clarify where and how Konverti was illegal.  Apple never responded.

17.     Defendant represented to Plaintiff that the Konverti concept was in compliance with all Apple Store policies and did not violate legal guidelines required. Indeed, the application was approved and placed on the Apple Store, inducing Plaintiff to pay Defendant monies and spend over $150k developing and marketing Konverti for over 2 years.   Had Plaintiff been aware, it would not have expended time and resources in developing the product.   Plaintiff has been damaged in that Apple's conduct and delays in providing access the Apple Store have caused significant loss of opportunity and impacted the market for Konverti.

## I.     Apple Monopolizes the iOS App Distribution Market.

**COMPLAINT**

18.     Apple designs, markets, and sells mobile computing devices including smartphones, which it brands as iPhones, and tablets, which it brands as iPads. Smartphones and tablets are portable electronic devices that can connect wirelessly to the internet and are capable of multipurpose computing functions. Similar to laptop and desktop personal computers, mobile devices such as smartphones and tablets require an operating system or "OS" that enables multipurpose computing functionality. An OS for mobile devices (a "mobile OS"), just like the OS of any computer, is a piece of software that provides basic functionality to users of smartphones. A mobile OS permits the installation and operation of apps that are compatible with the particular OS.

19.     Just as personal computers are sold to users with an OS pre-installed, smartphones and tablets are sold to users with a mobile OS pre-installed. Mobile device suppliers, commonly known in the industry as original equipment manufacturers ("OEMs"), will select and install an OS prior to shipping their respective devices for sale.

20.     The vast majority of OEMs do not develop or own a proprietary mobile OS, and must instead license a mobile OS for installation on their devices. The overwhelming majority of mobile devices sold by these OEMs use the Android OS, which is licensed by Google. In contrast, Apple uses a proprietary operating system called iOS, which it installs on the iPhone.  All iPhones and iPads are shipped with iOS pre-installed. Apple does not license or install any other mobile OS onto the iPhone or

**COMPLAINT**

iPad, nor does it license iOS to any other OEM for installation on devices other than Apple's.

21.     As such, for mobile device users, there are effectively only two mobile operating systems to choose from: Google's Android OS or Apple's iOS. These two operating systems account for nearly 100% of the worldwide mobile OSs.

22.     Mobile device users, including iOS device users, desire and use a number of apps, like Konverti, in connection with their devices. Apps software run on smartphones, facilitate and magnify the full range of the device's functionality. For example, apps support consumers' shopping, social networking, trading, barter, food ordering and delivery, personal email, newspaper subscriptions, video and music or streaming. The only channel for distributing iOS apps is the Apple Store.  There are currently almost 2 million apps on the Apple Store.

23.     The vast majority of apps are developed and programmed by third-party developers, although Apple and Google, who control iOS and Android OS, respectively, also develop and distribute apps of their own. To reach iOS app consumers, and to make their investment into developing iOS apps profitable, app developers need to be able to distribute their iOS apps to users.

24.     Apps are OS-specific. They must be programmed to function on the particular OS on which they will be downloaded and run. Therefore, apps developed for Android OS cannot substitute for apps designed for iOS. Developers who wish to distribute an app to users of devices with different OSs must therefore code different

versions of their app for distribution to the different sets of users. To reach iOS device users, developers must program an iOS-compatible version of their app and access to the Apple Store.

25.     Konverti has developed an app for the Android OS that is operational and available to Android users through Google Play, an equivalent platform for the Android OS.  However, Apple has prevented Konverti from being offered in its Apple Store. The iOS user base has nearly a billion iPhone users worldwide and over 1.5 billion active iOS devices. Typically, these users will use only iOS devices and will not also use mobile devices with a different OS. In addition to its size, the iOS user base is also uniquely valuable in that its user base spends more money on apps than Android users.

26.     iOS users and access to the Apple Store are therefore a "must have" market for app developers to compete in.  An app developer that chooses to develop apps for Android but not iOS creates an arbitrary availability that restricts the Konverti user base and hamstrings Plaintiff's ability to market Konverti, about 60% of which are Apple iPhone users. This is based on Google analytics data captured when Konverti was briefly live in June 2017.

27.     When Apple sells its iPhones and iPads, it chooses which apps to pre-install prior to the sale of the device to consumers, which Apple limits to its own apps, i.e., third-party apps do not come pre-installed.

## II.        The iOS App Distribution Market.

**COMPLAINT**

28.     There is a relevant market for the distribution of apps compatible with iOS to users of iOS devices, the iOS App Distribution Market. This market is comprised of all of the channels through which apps may be distributed to iOS device users. The only channel for distributing apps is the Apple Store.  Apple Stores allow consumers to browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps using just the mobile device and an internet connection.  iOS device users get their apps from an Apple Store and cannot substitute an app store, like Google Play, for distributing Android apps. iOS device users can use only the Apple Store, which is designed to run on iOS, and thus cannot substitute an app store designed for Android apps, like Google Play.

29.     Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for iOS devices must develop an iOS-specific version of the app and avail itself of the iOS App Distribution Market and Apple Store access.  The geographic scope of the iOS App Distribution Market is worldwide, as consumers and developers can access iOS worldwide.

### III.    Apple's Monopoly Power in the iOS App Distribution Market.

30.     Apple has a monopoly in the iOS App Distribution Market. This is because the Apple Store is the sole means by which apps may be distributed to consumers in that market. Apple's anti-competitive conduct forecloses all potential competitors from entering the iOS App Distribution Market. Apple prevents iOS users

from downloading apps from anywhere but the Apple Store; pre-installs its Apple Store on every iOS device it sells; disables iOS users' ability to remove the Apple Store from their devices; and conditions all app developers' access to iOS on the developers' agreement to distribute their apps solely through the Apple Store and not to distribute third-party app stores. Although Apple could permit developers to build and offer competing iOS app stores, it denies developers any opportunity to do so. Apple's power in the iOS App Distribution Market is absolute.

31.     As a result of Apple's conduct, app developers have no choice but to offer apps exclusively through the Apple Store to reach the enormous userbase of iOS devices and are foreclosed from distributing apps by any other means.

32.     Apple faces no constraints on its power in the iOS App Distribution Market. Non-iOS app distribution platforms do not constrain Apple's monopoly power in the iOS App Distribution Market because they are not compatible with iOS devices, they cannot provide iOS users with apps for their devices, and they do not contain iOS-compatible apps.

33.     Nor can app developers constrain Apple's anti-competitive conduct in the iOS App Distribution Market by declining to develop apps for iOS. If a developer does not develop apps for iOS, the developer must forgo all of the over one billion or so iOS users. Like Konverti, it is not economically viable without being on the iOS.  Thus, developers need to be on iOS.

**COMPLAINT**

34.     Lastly, competition in the sale of mobile devices does not constrain Apple's power in the iOS App Distribution Market because iOS device users face substantial switching costs and lock-in to the iOS ecosystem.  Further, regardless of the extent of competition in the sale of premium smartphones, competition at the smartphone level would not constrain Apple's power in the iOS App Distribution Market because consumers cannot adequately account for and therefore constrain Apple's anti-competitive conduct through their purchasing behavior.

## IV.   Apple's Anti-competitive Conduct in the iOS App Distribution Market

35.     Apple imposes unreasonable restraints and unlawfully maintains a monopoly in the iOS App Distribution Market through several anti-competitive acts, including technical restrictions  and contractual restrictions. There is no procompetitive justification for these anti-competitive acts.

### i.       Technical Restrictions

36.     Apple imposes several technical restrictions that foreclose competition in the iOS App Distribution Market. First, Apple prevents iOS users from downloading apps from other websites. Apple has designed technical restrictions into iOS that prevent users from downloading apps from anywhere but the Apple Store.  As a result, iOS consumers must use the Apple Store to download any apps to their devices, app developers must use Apple's Apple Store to distribute their apps to consumers and are unable to offer apps through other websites.

**COMPLAINT**

37.     Second, Apple pre-installs its Apple Store on the home screen of every iOS device it sells. Apple also disables iOS users' ability to remove the Apple Store from their devices.

### ii.     Contractual Restrictions

38.     Apple also imposes contractual restrictions that foreclose competition in the iOS App Distribution Market. First, Apple controls access to the Apple Store distribution channel.  Apple effects this unlawful condition by requiring that all iOS developers enter into Apple's Developer Agreement, a contract of adhesion and imposing arbitrary conditions on access to the Apple Store.

39.     The Apple Store is thus the only channel through which developers can distribute apps to the broad iOS userbase. By contractually conditioning developers' access to the Apple Store, Apple further forecloses competition in the iOS App Distribution Market, as developers are contractually prevented from appealing or challenging a decision to remove their app.

40.     Second, Apple conditions app developers' access to iOS on their agreement not to distribute apps independent of the Apple Store. Section 3.3.2(b) of the Developer Agreement prohibits "Application[s]" that "create a store or storefront for other code or applications".

41.     Further, Apple's Apple Store Review Guidelines which the Developer Agreement requires iOS developers to follow or risk removal from the Apple Store.

**COMPLAINT**

These Guidelines are arbitrarily enforced and used to restrict competition and shutdown apps for capricious reasons as is the case with Konverti.

42.     Apple has enforced these restrictions against Plaintiff. Plaintiff approached Apple to request that Apple allow Plaintiff to offer its Konverti app to its iOS users through the Apple Store.  Apple initially approved putting Konverti onto the Apple Store and then removed it without clarifying cause

### iii.     Lack of Procompetitive Justification

43.     There is no procompetitive justification for Apple's anti-competitive conduct in the iOS App Distribution Market.

44.     Apple has asserted that blocking Plaintiffs app is necessary to enforce legal  safeguards and prevent alleged criminal activity. This is a pretext that Apple has used to foreclose all competition in the iOS App Distribution Market in which it has absolute monopoly power.

45.     Given the lack of any justification, much less a sufficient one to justify the complete blocking of any competition, Apple's conduct imposes unreasonable restraints and unlawfully maintains its monopoly in the iOS App Distribution Market.

### V. Anti-competitive Effects in the iOS App Distribution Market.

46.     Apple's anti-competitive conduct forecloses competition in the iOS App Distribution Market, affects a substantial volume of commerce in this market, and causes anti-competitive harms to (i) would-be competing app distributors, (ii) developers, and (iii) consumer.

**COMPLAINT**

47.     First, Apple's anti-competitive conduct harms all would-be app distributors by foreclosing them from competing in the iOS App Distribution Market. But for Apple's restrictions, would-be competing app distributors, such as Konverti, could develop and offer iOS-compatible app stores, thereby providing consumers and developers choice beyond Apple's own Apple Store.

48.     Second, Apple's anti-competitive conduct harms developers. Apple's conduct denies developers the choice of how best to distribute their apps. Developers are barred from reaching over one billion iOS users unless they go through the Apple's Store, and on Apple's terms. Developers cannot distribute their apps through competing app stores that could offer, for example, increased visibility, better or cheaper marketing or even as an alternative when Apple keeps you out. Nor can developers offer their apps directly though their own websites.  Thus, developers are dependent on Apple's arbitrary process.  Apple may deny access to the Apple Store, change the terms of access, or alter the tax it imposes on developers, all in its sole discretion and on the commercially devastating threat of the developer losing access to the entire iOS userbase.

49.     Apple's total foreclosure of any competition in the iOS App Distribution Market reduces the competitive pressure for Apple to innovate and improve its own Apple Store, leaving developers with no options compared to what would exist if competition were to drive further development and innovation in the market. Additionally, Apple's conduct increases developers' costs and investor risk.

50.     Third, Apple's anti-competitive conduct harms consumers. Apple's conduct denies consumers choice, as they are forced to obtain apps solely through the Apple Store, and Apple alone dictates which apps are available.

51.     Apple's foreclosure of the Plaintiff's app has no procompetitive justification. There is no legal or security justification for preventing it's use. In addition, Apple's anti-competitive conduct harms developers, including Plaintiff. Apple's conduct denies developers innovation, Apple's conduct denies developers innovation, which would drive competition.

52.     But for Apple's restrictions, developers could choose other options. Consumers typically commit to Apple's ecosystem by purchasing more than one Apple device, which further increases their investment in iOS.  Apple has developed a number of services that work exclusively on Apple devices to facilitate the interaction between Apple devices and encourage multiproduct ownership.

## FIRST CAUSE OF ACTION

**Sherman Act § 2 (Unlawful Monopoly Maintenance in the iOS App Distribution Market)**

53.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**COMPLAINT**

54.    Apple's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

55.    The iOS App Distribution Market is a valid antitrust market. Apple holds monopoly power in the iOS App Distribution Market. Apple unlawfully maintains its monopoly power in the iOS App Distribution Market through the anti-competitive acts described herein, including by imposing technical and contractual restrictions on iOS, which prevents the distribution of iOS apps through means other than the Apple Store and prevents developers from distributing competing app stores to iOS users.

56.    Apple's conduct affects a substantial volume of interstate as well as foreign commerce. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. As an app distributor and as an app developer, Plaintiff has been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues. To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## SECOND CAUSE OF ACTTION

**Sherman Act § 2 (Denial of Essential Facility in the iOS App Distribution Market)**

**COMPLAINT**

57.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

58.     Apple's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

59.     The iOS App Distribution Market is a valid antitrust market. Apple holds monopoly power in the iOS App Distribution Market. Apple unlawfully maintains its monopoly power in the iOS App Distribution Market through its unlawful denial to Plaintiff and other app distributors of an essential facility—access to Apple Store—which prevents them from competing in the iOS App Distribution Market.

60.     Apple controls iOS, which is essential to effective competition in the iOS App Distribution Market. App distributors are unable to reasonably or practically duplicate Apple's iOS. It is technically feasible for Apple to provide access to iOS to Plaintiff and other app distributors, and it would not interfere with or significantly inhibit Apple's ability to conduct its business.

61.     Apple's denial of access to Konverti has no legitimate business purpose, and serves only to assist Apple in maintaining its unlawful monopoly position in the iOS App Distribution Market. Through its denial of its essential facility, Apple maintains its monopoly power in the iOS App Distribution Market. Apple's conduct affects a substantial volume of interstate as well as foreign commerce.

**COMPLAINT**

62.     Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output. As an app distributor and as an app developer, Plaintiff has been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues. Plaintiff spent $150,000 developing Konverti in Apple's Developer environment.

63.     To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## THIRD CAUSE OF ACTION

**Sherman Act § 1 (Unreasonable Restraints of Trade in the iOS App Distribution Market)**

64.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

65.     Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

66.     The iOS App Distribution Market is a valid antitrust market. To reach iOS users, Apple forces developers to agree to Apple's unlawful terms contained in its

Developer Agreement and to comply with Apple's Apple Store Review Guidelines, including the requirement iOS developers distribute their apps through the Apple Store.

67.     These contractual provisions unlawfully foreclose the iOS App Distribution Market to competitors and maintain Apple's monopoly. The challenged provisions of the Developer Agreement and the terms of the Apple Store Review Guidelines unreasonably restrain competition in the iOS App Distribution Market and serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects.

68.     Apple's conduct and unlawful contractual restraints affect a substantial volume of interstate as well as foreign commerce. Apple's conduct has substantial anti-competitive effects, including, increased prices to users and increased costs to developers, reduced innovation, and reduced quality of service and lowered output.

69.     Plaintiff suffered injury to its business by foreclosing Konverti from competing in the iOS App Distribution Market. Plaintiff is also harmed as an app developer because it has no choices for distributing its apps to iOS device users other than the Apple Store and therefore suffers the anti-competitive effects felt by all app developers that are described above. Plaintiff has been and continues to be directly harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues.

**COMPLAINT**

70.     To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## FOURTH CAUSE OF ACTION

### California Cartwright Act (Unreasonable Restraints of Trade in the iOS App Distribution Market)

71.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

72.     Apple's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, inter alia, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. See §§ 16720, 16726.

73.     Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

74.     The iOS App Distribution Market is a valid antitrust market. Apple has monopoly power in the iOS App Distribution Market. Apple forces developers to agree to Apple's unlawful terms contained in its Developer Agreement, including that iOS developers distribute their apps through the Apple Store. The Developer Agreement contains the unlawful requirement that developers distribute their apps through the Apple Store. Apple also conditions app distributors' access to the Apple Store on their agreement not to distribute third-party app stores. Section 3.3.2(b) of the Developer

**COMPLAINT**

Agreement prohibits "Application[s]" that "create a store or storefront for other code or applications". These provisions unreasonably restrain competition in the iOS App Distribution Market.

75.     These challenged provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the iOS App Distribution Market. Apple's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

76.     Apple's conduct harms Plaintiff which, as a direct result of Apple's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its iOS application and to market a competing app store to the Apple Store.

77.     It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers and developers reside in California, Apple has its principal place of business in California, and overt acts in furtherance of Apple's anti- competitive scheme took place in California.

78.     Plaintiff has suffered and continues to suffer harm, and such harm will not abate until an injunction ending Apple's anti-competitive conduct issues. To prevent these ongoing harms, the Court should enjoin the anti-competitive conduct complained of herein.

## FIFTH CAUSE OF ACTION

**COMPLAINT**

**(Violation of California Business and Professions Code Section 17200, et. Seq.)**

79.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

80.    California Business and Professions Code, §17200, et. Seq. prohibits acts of unfair competition which includes any "unlawful, unfair, fraudulent business act or practice" and conducts which is "likely to deceive".

81.    Apple's conduct alleged herein constitutes unlawful, unfair and fraudulent conduct under Cal. Bus. And Prof. Code, §17200 ET. Seq.  Apple has deceptively and unfairly: failed to implement policies and procedures that would prevent deceptive and unfair conduct; induced Plaintiff to develop an application by making false representations and then arbitrarily removing it from the Apple Store based on information that was available to Apple since the beginning of the relationship but does not qualify reasons for removal.

82.    The harm to Plaintiff and to the general public outweighs the utility of Apple's conduct.  Plaintiff has suffered injury in fact and has lost money or suffered damages in the form of restitution as a result Apple's unfair competition and practices.

83.    Apples unlawful or unfair business practices as described herein are continuing, capable of repletion, and will continue unless restrained and enjoined by the Court. Plaintiff has no adequate remedy at law and is entitled to an injunction

**COMPLAINT**

restraining Apple, its officers, agents and employees and all person, acting in concert with Apple, from engaging in further acts of unfair competition.

84.    Plaintiff is further entitled to recover from Apple the actual damages that is sustained and/or is likely to sustain as a result of Apple's wrongful acts. Plaintiff is presently unable to ascertain the full extent of the monetary damages that it has suffered and/or is likely to suffer by reason of Apple's acts.

85.    Plaintiff has determined that the only way to protect its property and protect its rights is to obtain an injunction compelling the Apple to restore Konverti to the Apple Store.  Plaintiff has no adequate remedy at law to prevent Apple from continuing to refuse and failing to comply.

86.    Unless and until a mandatory injunction is issued by this Court which requires Apple to perform, the violations will continue to occur to the detriment of Plaintiff and will cause Plaintiff to suffer irreparable harm in that their interest in its property will continue to be harmed and will continue to be impaired.

87.    Plaintiff is therefore entitled to injunctive relief, restitution and civil penalties as available under California Business and Professions Code Sec. 17200 and related sections.  These acts and practices, as described in the previous paragraphs, are unfair and violate Business and Professions Code § 17200 because their policies and practices described above violate all the statutes previously listed as well as California Civil Code § 1709, and consequently, constitute and unlawful business act of practice within the meaning of Business and Professions Code § 17200.

**COMPLAINT**

88.     Plaintiff's enforcement of this action affects an important public interest as Apple's conduct prevents developers and consumers from accessing the online and mobile marketplace and services.  Plaintiff  is entitled to attorney's fees pursuant to Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant Apple:

1. Issuing an injunction prohibiting Apple's anti-competitive conduct and mandating that Apple take all necessary steps to cease unlawful conduct and to restore competition;

2. Awarding a declaration that the contractual and policy restraints complained of herein are unlawful and unenforceable.

3. For an Injunction against Defendants to reinstate Konverti to the Apple Store.

4. For restitution in an amount according to proof at trial, against all Defendants.

5. Civil Penalties as allowed under California Business and Professions Code Sec. 17200 and related sections

6.  For reasonable attorney's fees pursuant to Code of Civil Procedure § 1021.5

**COMPLAINT**

1

2

7.  Costs

3

8.  For such other and further relief as the Court deems proper.

4

5

6

DATED:      05/01/21

7

8                                                    /s/Omero Banuelos
                                                     Omero Banuelos,
9                                                    Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**