1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    THOMAS M REILLY,                          Case No. 21-cv-04601-EMC

8                     Plaintiff,

9           v.                                 ORDER GRANTING DEFENDANT'S
                                               MOTION TO DISMISS
10   APPLE INC.,
                                               Docket No. 24
11                    Defendant.

12

13

14                          I.      INTRODUCTION

15          Plaintiff Thomas M. Reilly, the developer of an app called Konverti which facilitates peer-

16   to-peer, in-person currency exchanges, alleges antitrust violations and unfair and anticompetitive

17   conduct by Apple, Inc. ("Apple") through its monopolist operation of its App Store.  Docket No. 1

18   ("Compl.").  Plaintiff's app was allegedly approved and then abruptly removed by Apple from the

19   App Store in 2017.  *Id.* ¶ 7.  In this action, Plaintiff seeks damages and injunctive relief to restore

20   the Konverti app to the App Store and to alter Apple's operation of the App Store.

21          Now pending is Apple's motion to dismiss Plaintiff's complaint.  Docket No. 24.  For the

22   reasons explained below, the Court **GRANTS** Apple's motion to dismiss.

23                          II.     BACKGROUND

24   A.     Summary of Allegations

25          1.      Apple's App Approval Process

26          According to the Complaint, "Apple designs, markets and sells smartphones, personal

27   computers, tablets, wearables and accessories, and sells a variety of related services." Compl. ¶ 2.

28   Apple has created an ecosystem for its iOS devices, such as the iPhone and iPad. *See id.* ¶¶ 18, 20,

United States District Court
Northern District of California

52.  Apple also operates the App Store, a platform through which iOS users and developers can transact.  *Id.* ¶ 2. While Apple develops and distributes its own apps to users, *id.* ¶ 27, most native apps offered for download on the App Store are developed by third-party developers, *id.* ¶ 23. Apps for iOS devices can only be purchased through the App Store.  *Id.* ¶¶ 22, 24.

To license Apple's proprietary software and distribute apps through its ecosystem, developers agree to abide by a Developer Program License Agreement ("DPLA").  Compl. ¶¶ 12, 66.  This alleged "contract of adhesion" is standardized and imposes the same terms on all developers.  *Id.* ¶ 38; *see also id.* ¶ 41.  Pursuant to the DPLA, developers agree to abide by Apple's App Review Guidelines.  While these Guidelines guide Apple's app review team, Apple retains "sole discretion" to reject any app that a developer seeks for distribution through Apple's App Store.  Docket No. 25, Exh. 1 (DPLA) § 6.9(b); *see also id.*, Exh. 2 ("Guidelines") at 1[1] ("We do this by offering a highly curated App Store where every app is reviewed by experts. . . For everything else there is always the open Internet.  If the App Store model and guidelines are not best for your app or business idea that's okay, we provide Safari for a great web experience too.").

2.    Plaintiff's App and Removal from the App Store

Plaintiff Thomas Reilly alleges that he is the developer of Konverti, which he describes as "a Peer to Peer Currency Exchange."  Compl. ¶ 5.  Konverti allegedly "facilitates person to person exchanges of small amounts of currency."  *Id.*  Aside from alleging that each user's "identification is vetted through Apple's identity management system," *id.* ¶ 6, the Complaint does not otherwise describe Konverti's function or operation.  Plaintiff alleges that Konverti was approved by the Google Play Store and is currently available through Google Play for Android system users.  *Id.* ¶ 6.

Konverti was allegedly "approved and placed" in Apple's App Store in June 2017 before it was "abruptly removed weeks later without clear cause."  Compl. ¶¶ 7, 15, 26.  Apple allegedly provided two reasons for Konverti's removal.  First, Apple determined that the app was not safe. *Id.* ¶ 15.  Second, Apple determined Konverti violated Guideline 5.0.  *Id.*  This Guideline

_____

[1] The agreements and Guidelines are "central" to Plaintiff's claims, and are incorporated by reference in the FAC.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

1   provides:

> Apps must comply with all legal requirements in any location where
> you make them available (if you're not sure, check with a lawyer).
> We know this stuff is complicated, but it is your responsibility to
> understand and make sure your app conforms with all local laws, not
> just the guidelines below. And of course, apps that solicit, promote,
> or encourage criminal or clearly reckless behavior will be rejected.
> In extreme cases, such as apps that are found to facilitate human
> trafficking and/or the exploitation of children, appropriate
> authorities will be notified.

Exh. 2 § 5.0.  Plaintiff alleges that Apple explained that it "continue[d] to find [Plaintiff's] app still facilitates individuals meeting in person for currency exchange, which is not an appropriate concept for the App Store" and that Plaintiff should "review [his] app concept and remove all content and features that are illegal in the locations where your app is available."  Compl. ¶ 15 (quotation marks omitted).  Plaintiff alleges that he unsuccessfully appealed Konverti's removal "multiple times" between June 2017 and 2020.  *Id.*  Plaintiff alleges that he is aware of no "security, legal or reporting requirements" triggered by Konverti.  *Id.* ¶ 6.  Plaintiff alleges that because Konverti was initially "approved and placed" on the App Store, Plaintiff was induced "to pay [Apple] monies and spend over $150k developing and marketing Konverti for over two years."  *Id.* ¶ 17.  Plaintiff alleges he "has been damaged in that Apple's conduct and delays in providing access [to] the [App] Store have caused significant loss of opportunity and impacted the market for Konverti."  *Id.*

　　　　3.　　Plaintiff's Antitrust Claim Theory

　　　　Plaintiff brings suit under federal and state antitrust law.  He explains that "mobile device suppliers, commonly known in the industry as original equipment manufacturers ("OEMs"), will select and install an OS [operating system] prior to shipping their respective devices for sale."  *Id.* ¶ 19.  He alleges that the "overwhelming majority of mobile devices sold by these OEMs use the Android OS, which is licensed by Google," but, in contrast, "Apple uses a proprietary operating system called iOS, which it installs on the iPhone" and iPad.  *Id.* ¶ 20.  The "only channel for distributing iOS apps" (apps that are functional on Apple devices that use iOS) is through Apple's App Store.  *Id.* ¶ 22.

　　　　Plaintiff alleges that Apple monopolizes the "iOS App Distribution Market" through

3

"technical" and "contractual" restrictions.  Compl. ¶¶ 18–42.  He claims that:

- Apple "unlawfully maintains its monopoly power in the iOS App Distribution Market" in violation of Section 2 of the Sherman Act by "prevent[ing] the distribution of iOS apps through means other than the Apple Store and prevent[ing] developers from distributing competing app stores to iOS users," Compl. ¶ 55 (Count 1);

- Apple violates Section 2 by denying Konverti access to a purported essential facility, "iOS," *id.* ¶¶ 58–61 (Count 2); and

- The "Developer Agreement and the terms of the Apple Store Review Guidelines unreasonably restrain competition" in violation of Section 1, *id.* ¶ 67 (Count 3).

Plaintiff contends that the same conduct violates California's Cartwright Act (Count 4) and Unfair Competition Law (Count 5).  *Id.* ¶¶ 71–88.

Plaintiff defines the relevant market for his antitrust claims as the "market for distribution of apps compatible with iOS to users of iOS devices" which is comprised of "all of the channels through which apps may be distributed to iOS devices," which, in turn, is limited to Apple's App Store because it is the "only channel for distributing apps" to iOS devices.  *Id.* ¶ 28.  Plaintiff alleges that the "geographic scope of the iOS App Distribution Market is worldwide, as consumers and developers can access iOS worldwide."  *Id.* ¶ 29.

B.    Procedural Background

In December 2018, Mill Lane Productions, LLC, purporting to be the developer of the Konverti app and which was represented by the same counsel as Plaintiff, sued Apple in the Superior Court of California, County of Santa Clara alleging negligent misrepresentation and violation of California's unfair competition law for Apple's removal of Konverti from the App Store.  Docket No. 25, Exh. 3 ("State Court Compl.").  After twice amending its complaint in response to Apple's demurrers, *id.*, Exh. 4, Mill Lane voluntarily dismissed its case without prejudice on February 5, 2020, *id.*, Exh. 5.

Plaintiff Reilly filed this case in June 2021, alleging that he is the developer of Konverti.  Compl. ¶ 5.  Mill Lane is not mentioned in this action; Plaintiff has not filed a disclosure of non-party interested entities pursuant to Local Rule 3-15.

4

1    Now pending is Apple's motion to dismiss the complaint for failure to state a claim.

2    Docket No. 24 ("Motion").

3                    **III.      LEGAL STANDARD**

4    A.    Failure to State a Claim (Rule 12(b)(6))

5    Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

6    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

7    complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

8    Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's

9    decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

10    U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the

11    claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

12    Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the

13    pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

14    *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not

15    simply recite the elements of a cause of action [and] must contain sufficient allegations of

16    underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

17    *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

18    990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

19    content that allows the court to draw the reasonable inference that the Defendant is liable for the

20    misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

21    'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

22    unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

23                    **IV.      ANALYSIS**

24    A.    Antitrust Claims (Counts 1-4)

25    Apple seeks to dismiss Plaintiff's antitrust claims because Plaintiffs fail to allege facts

26    sufficient to meet two threshold conditions to proceed on any antitrust theory: (1) a plausible

27    relevant market for their claims, and (2) antitrust injury.  For the reasons stated below, the Court

28    dismisses all of the antitrust claims for Plaintiff's failure to satisfy these threshold conditions.

United States District Court
Northern District of California

1    1.    Relevant Market for Antitrust Claims

2    "A threshold step in any antitrust case is to accurately define the relevant market, which

3    refers to 'the area of effective competition.'"  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d

4    974, 992 (9th Cir. 2020) (citation omitted); *see also Image Tech. Servs., Inc. v. Eastman Kodak

5    Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field in which meaningful

6    competition is said to exist." (citing *United States v. Continental Can Co.*, 378 U.S. 441, 449

7    (1964))).  Market definition is an essential predicate to the entire case, for "[w]ithout a definition

8    of [the] market there is no way to measure [the defendant's] ability to lessen or destroy

9    competition.'"  *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018); *Flagship Theatres of

10   Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 413 (Cal. Ct. App. 2020)

11   (noting the same under California's Cartwright Act).  Accordingly, an antitrust plaintiff must

12   plead a plausible relevant market—including "both a geographic market and a product market"—

13   to state a claim.  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *see also hiQ Labs,

14   Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) ("[T]he relevant market must

15   still be plausibly alleged to make it past a 12(b)(6) challenge.").

16        a.    Plaintiff Fails to Allege a Plausible Relevant Product Market

17   Where a complaint fails to adequately allege a relevant market underlying its antitrust

18   claims, those claims must be dismissed.  *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D.

19   Cal. Mar. 11, 2021); *Coronavirus Reporter v. Apple, Inc.*, No. 21-CV-05567-EMC, 2021 WL

20   5936910, at *7 (N.D. Cal. Nov. 30, 2021).  A relevant product market "must encompass the

21   product at issue as well as all economic substitutes for the product."  *Newcal Indus., Inc. v. Ikon

22   Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  "The principle most fundamental to product

23   market definition is 'cross-elasticity of demand' for certain products or services," a measure of

24   interchangeability or substitutability of related products.  *Kaplan v. Burroughs Corp.*, 611 F.2d

25   286, 291–92 (9th Cir. 1979).  "Commodities which are 'reasonably interchangeable' for the same

26   or similar uses normally should be included in the same product market for antitrust purposes."

27   *Id.*  "This interchangeability is largely gauged by the purchase of competing products for similar

28   uses considering the price, characteristics and adaptability of the competing commodities."  *United

United States District Court
Northern District of California

6

*States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380–81 (1956).  "In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers."  *Kaplan*, 611 F.3d at 292 (citing *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978)).  "Illegal monopoly does not exist merely because the production of a particular product is 'monopolized'" without regard to alternative substitutes.  *Id.*  A plaintiff cannot ignore economic reality and "arbitrarily choose the product market relevant to its claims"; rather, the plaintiff must "justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand."  *Buccaneer Energy (USA) v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) (internal quotation marks and citation omitted).

Here, Plaintiff alleges a single relevant product market for his antitrust claims: the iOS App Distribution Market he asserts consists entirely and exclusively of Apple's App Store. Compl. ¶¶ 28, 29.  Plaintiff's proposed market fails for several reasons.

First, Plaintiff essentially asserts a *single-brand* market *defined* as Apple's App Store. "Single-brand markets are, at a minimum, extremely rare" and courts have rejected such market definitions "[e]ven where brand loyalty is intense."  *Apple, Inc. v. Psystar Corp*., 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (internal quotation marks and citation omitted).  On the other hand, as the court in *Epic v. Apple* recently reiterated, "[a] single brand is never a relevant market when the underlying product is fungible." *Epic Games, Inc. v. Apple Inc*., No. 4:20-CV05640-YGR, 2021 WL 4128925, at *87 (N.D. Cal. Sept. 10, 2021) (citation omitted, emphasis in the original). "It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets[.]" *In re Am. Express Anti-Steering Rules Antitrust Litig*., 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019); Herbert J. Hovenkamp, Markets in IP & Antitrust, 100 Geo. L.J. 2133, 2137 (2012) ("[A]ntitrust law has found that a single firm's brand constitutes a relevant market in only a few situations."). To be sure, "[a]ntitrust markets consisting of just a single brand, however, are not per se prohibited. . . .. In theory, it may be possible that, in rare and unforeseen circumstances, a relevant

market may consist of only one brand of a product." *Psystar Corp.* at 1198.

The Supreme Court and Ninth Circuit have only found single-brand markets plausible in the context of *aftermarkets* which are "wholly derivative from and dependent on the primary market." *Newcal Indus.*, 513 F.3d at 1049; *see also Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007) ("[T]he few cases in which courts have acknowledged the possibility of limiting the relevant market to a single brand have involved markets for replacement parts for specific brands of durable goods where consumers are 'locked-in' to maintaining them.").

Yet Plaintiff does not allege that the "iOS App Distribution Market" is an aftermarket.[2] Despite alleging that the *primary* market in this case should be a single-brand market, Plaintiff does not cite a single antitrust case that has *ever* recognized a *single-brand primary market*. *Cf.* Docket No. 31 ("Opp.") at 4-5.

Moreover, the complaint provides no explanation for limiting the relevant market to a *single-brand market* defined around *Apple's distribution of iOS apps* when the complaint concedes that "the overwhelming majority of mobile devices sold by [original equipment manufacturers] *use the Android OS, which is licensed by Google*," and that Plaintiff's app is available through Google Play for Android system users. Compl. ¶¶ 6, 20. Consumers who want Konverti can obtain it through Google Play Store on devices with Android OS. And as Plaintiff conceded at the oral argument, Konverti can be configured as an app available on the Internet, as a web-based app, and then accessed through a web browser on an iOS device. Plaintiff provides no

---

[2] Plaintiff's opposition brief does not dispute Apple's argument that Plaintiff failed to allege the relevant market as an aftermarket. Indeed, the word "aftermarket" does not appear in Plaintiff's complaint nor in its opposition brief. Nonetheless, setting aside Plaintiff's failure to clearly articulate its intention to propose a single-brand aftermarket, the allegations in the complaint do not suffice to plausibly allege a single-brand aftermarket under Ninth Circuit precedent. Under *Newcal*, to plausibly assert a single-brand aftermarket at the pleading stage, a Plaintiff is required to adequately allege that (1) the aftermarket is wholly derivative from the primary market, (2) the illegal restraints of trade relate only to the aftermarket, (3) the defendant did not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market, and (4) competition in the initial market does not suffice to discipline anticompetitive practices in the aftermarket. 513 F.3d at 1048-50. At most, Plaintiff's complaint gestures at fourth factor. *See* Compl. ¶¶ 32-34. But even these statements amount to conclusory assertions and formulaic recitations of the element, devoid of specific factual allegations to satisfy Rule 12(b)(6). *Levitt*, 765 F.3d at 1135.

United States District Court
Northern District of California

basis for limiting the market definition to the App Store and excluding other platforms that provide access to apps, such as web-based apps that can be accessed from any web browser, including from iOS devices, or the Google Play Store where Plaintiff acknowledges the Konverti app is currently available.  Thus, because "[d]istribution can occur through web apps, by web access, and through other [app] stores," *Epic*, 2021 WL 4128925 at *113, Plaintiff's failure to address or analyze these plausible alternatives is fatal to his proposed market definition, *Pistacchio*, 2021 WL 949422 at *2; *see also Hicks*, 897 F.3d at 1122–23 (affirming dismissal because alleged market was implausible without explanation of why potential substitutes were not interchangeable); *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) (rejecting the plaintiff's narrow market definition where alternatives "permit[ted] users to accomplish the same basic task"); *Federal Trade Commission v. Lab. Corp. of Am.*, No. SACV 10-1873 AG (MLGx), 2011 WL 3100372, at *18 (C.D. Cal. Feb. 22, 2011) (stating courts "routinely recognize that otherwise identical products are not in separate markets simply because consumers pay for those products in different ways"); *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2020 WL 5408210, at *7 (N.D. Cal. Sept. 9, 2020) (holding that plaintiff had "not yet shown that it is *plausible* that the relevant market should be defined as that which uses only [defendant's] data" where alternative public channels exist to obtain similar data (emphasis in original)).  This Court similarly rejected proposed single-brand antitrust market of "iOS Institutional App Market")in *Coronavirus Reporter*, 2021 WL 5936910, at *9-11.

Although the "principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services," *Kaplan*, 611 F.2d at 291–92 the complaint lacks any discussion of cross-elasticity of demand for certain products or services.  Plaintiff concedes that complaint fails to engage such an analysis or to define "'the area of effective competition.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); Opp. at 4-5.  Instead, Plaintiff argues his failure to provide analysis of cross-elasticity of demand in the complaint "is not fatal to Plaintiff's claims" because each of the submarkets alleged are well-defined in themselves, and their boundaries can be refined through discovery. Opp. at 4-5 (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)).  This is incorrect.  "Authorities far too numerous to cite or

discuss in detail have established" that "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'" *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," therefore, "the relevant market is legally insufficient." *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

In short, a plausible market requires alleged facts explaining why the products *included* in the market *are substitutes* for one another as well as alleged facts explaining why seemingly similar products *excluded* from the market *are not substitutes* for those in the market. Plaintiffs "iOS distribution services market" asserted here lacks justification on both bases.

b.    Plaintiff Fails to Allege a Plausible Relevant Geographic Market

Plaintiff has also failed to allege facts indicating that the "area of effective competition where buyers can turn for alternate sources of supply" is worldwide. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (quotation marks and ellipsis omitted). Taking Plaintiff's proposed market definition of *all* app transactions on the App Store *worldwide,* the relevant inquiry is whether *all* consumers and *all* developers of *all* iOS apps across the world operate in one "area of effective competition." *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977) (quotation marks omitted). There is no allegation that, *e.g.*, users in every country access the same App Store storefront; that users in different countries can download the same array of apps; or that the commercial realities for developing, marketing, distributing, and supporting apps are the same in every country.    Thus, the Complaint does not contain allegations sufficient to support the global geographic scope that Plaintiff's proposes.

c.    Conclusion Regarding Relevant Market

In sum, Plaintiff's complaint fails to allege plausible product or geographic markets, which are threshold showings for Plaintiff's antitrust claims. Thus, the Court grants Apple's motion to dismiss as to all of Plaintiff's antitrust claims (Counts 1-4). *See Qualcomm*, 969 F.3d at 992 (courts cannot "assess[] alleged antitrust injuries . . . in the market where competition is [allegedly] being restrained" without "an accurate definition of the relevant market," which is indispensable to "measur[ing] [the defendant's] ability to lessen or destroy competition").

1    2.    <u>Antitrust Injury</u>

2         a.    <u>Failure to Allege Injury to Competition</u>

3    Apple's second threshold argument for dismissal of Plaintiff's antitrust claims is that

4    Plaintiff fail to plead antitrust injury.  *Somers v. Apple, Inc.*, 729 F.3d 953, 964 n.5 (9th Cir. 2013);

5    *see also In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. MDL092074PSGFFMX,

6    2013 WL 12130034, at *11 (C.D. Cal. July 19, 2013) (explaining that antitrust injury under the

7    Cartwright Act is analyzed under the same general framework as federal law).   To allege antitrust

8    injury, a plaintiff must allege injury to "competition in the market as a whole"—such as

9    marketwide reduction in output or increase in prices—"not merely injury to itself as a competitor."

10   *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir.

11   2013).  Thus, a plaintiff may not merely allege that the defendant is engaged in some

12   anticompetitive conduct and that "some injury is occurring."  *Town Sound & Custom Tops, Inc. v.*

13   *Chrysler Motors Corp.*, 959 F.2d 468, 486–87 (3d Cir. 1992) (en banc).  To state a claim, a

14   "plaintiff must *link* the two showings with a theory of causation that is both plausible and

15   cognizable by the antitrust laws."  *Id.* (emphasis added).  The alleged harm also must be

16   "'attributable to an anticompetitive aspect of the practice under scrutiny[;]'" "harm that could have

17   occurred under the normal circumstances of free competition" does not suffice.  *In re NFL's*

18   *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (quoting *Atl. Richfield Co. v.*

19   *USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

20        Plaintiff's theory of harm is that *his* app was rejected from the App Store notwithstanding

21   *his* investment in Konverti.  Compl. ¶ 17.  This theory fails to connect his supposed injury to

22   injury to competition generally.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

23   488 (1977) ("The antitrust laws . . . were enacted for the protection of competition not

24   competitors.") (quotation marks omitted).  There is no allegation, for example, that the imposition

25   of the guideline under which Konverti was rejected or that the App Review process stifles

26   marketwide output or increases prices.  *See* Compl. ¶¶ 40–41.  Nor does Plaintiff contend that

27   Apple's removal of apps erroneously approved for distribution on the App Store—the alleged

28   cause of his lost investment, *id.* ¶ 17—has any deleterious impact on competition.  *See Pool Water*

United States District Court
Northern District of California

*Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("The critical question for determining whether there is antitrust injury is whether the harm is of the kind the antitrust laws were meant to protect against").  As this Court ruled in *Coronavirus Reporter*, 2021 WL 5936910, at *14, "The allegations of injury contained in the FAC are either confined to specific harms experienced by Plaintiffs or a small group of competitors, rather than harm to the market.  None of the allegations in the FAC allege harm generally to the market of transactions for apps across a relevant market."

Plaintiff cannot demonstrate antitrust injury sufficient to sustain his claims through references to alleged anticompetitive acts that have no relation to Plaintiff or the harm that he experienced.  For example, Plaintiff repeatedly notes that Apple does not allow competing app stores on iOS.  *See* Compl. ¶¶ 30, 47, 55.  But Plaintiff does not allege that he sought to create such a competing store.  Similarly, Plaintiff suggests Apple's pre-installation of certain apps, including the App Store, is anticompetitive without an allegation that this affected him or his app, Konverti, in any way.  *See id.* ¶¶ 27, 37.

Plaintiff's allegation that "Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output," Opp. 5–6 (quoting Compl. ¶ 56) is wholly conclusory and simply constitutes "threadbare recitals" of the elements of antitrust injury insufficient to state a claim. *Iqbal*, 556 U.S. at 663.  To plead antitrust injury, one cannot "merely recite the bare legal conclusion that competition has been restrained unreasonably" but must "at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (quotation marks omitted; alteration in original); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) (rejecting as "nothing more than conclusory" allegations that plaintiffs "'had their business and assets destroyed by Facebook's anticompetitive scheme,' and are prevented from entry or reentry into the relevant markets because of Facebook's exclusionary conduct"); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc*., 305 F. Supp. 3d 1065, 1074 (N.D. Cal. 2018) (dismissing antitrust claims because "there are no non-conclusory allegations that [Defendant's] actions restrained trade in the relevant market or injured overall competition" and the allegations "lack

1    factual enhancement and are conclusory.").[3]

2            b.    Conclusion

3            Thus, Plaintiff fails to adequately plead antitrust injury. This failure provides a second and

4    independent basis for the Court to dismiss Plaintiff's antitrust claims (Counts 1-4). Because

5    Plaintiff has failed to make the threshold showings of a plausible a relevant market and alleging

6    antitrust injury, the Court need not analyze whether he has alleged facts sufficient to satisfy the

7    substantive elements of Plaintiff's particular antitrust claims. See *e.g.*, *Amex*, 138 S. Ct. at 2285

8    (Market definition is an essential predicate to the entire case, for "[w]ithout a definition of [the]

9    market there is no way to measure [the defendant's] ability to lessen or destroy competition.'").

10   B.    Unfair Competition Claim (Count 5)

11           Plaintiff's fifth cause of action under California's Unfair Competition Law, Cal. Bus. &

12   Prof. Code § 17200, is premised on the following allegation:

13           Apple's conduct alleged herein constitutes unlawful, unfair and
             fraudulent conduct under Cal. Bus. And Prof. Code, §17200 ET.
14           Seq. Apple has deceptively and unfairly: failed to implement
             policies and procedures that would prevent deceptive and unfair
15           conduct; induced Plaintiff to develop an application by making false
             representations and then arbitrarily removing it from the Apple Store
16           based on information that was available to Apple since the
             beginning of the relationship but does not qualify reasons for
17           removal.

18   Compl. ¶ 81. To the extent the claim is derivative of Plaintiff's allegations of antitrust violations,

19   the UCL claim falls with those claims. *City of San Jose v. Off. of the Comm'r of Baseball*, 776

20   F.3d 686, 691–92 (9th Cir. 2015) ("An independent claim under California's UCL is therefore

21   barred so long as [the defendant's] activities are lawful under the antitrust laws."); *see also*

22   *Aleksick v. 7–Eleven, Inc.*, 205 Cal. App. 4th 1176, 1185 (Cal. Ct. App. 2012) ("When a statutory

23   claim fails, a derivative UCL claim also fails.").

24

25   _____

26   [3] Plaintiff's relevant market definition and theory of antitrust injury also fail to apprehend or
     analyze the two-sided nature of the marketplace of transactions for apps where Apple's App Store
     functions as an intermediary between the respective sides – app developers and end users. *See*
27   *Coronavirus Reporter*, 2021 WL 5936910, at *12-15. Although Apple does not advance this
     argument in the pending motion, should Plaintiff seek to amend his complaint to plausibly state a
28   claim, Plaintiff must allege a relevant market and theory of antitrust injury that addresses the two-
     sided nature of the relevant market. *See id.*

United States District Court
Northern District of California

1  Plaintiff contends that the UCL claim encompasses an additional claim "on top of the

2  alleged antitrust violations." Opp. at 10. Plaintiff argues Count 5 includes an independent claim

3  under the UCL that "Defendant has deceptively" failed to "implement policies and procedures that

4  would prevent deceptive practices and induced Plaintiff to develop an application by making false

5  representations and then arbitrarily removing it from the App Store based on information that was

6  available to Defendant since the beginning of their 2-year relationship." *Id.*

7  Plaintiff's additional UCL claim then sounds in fraud, which requires him to plead it with

8  particularity under Fed. R. Civ. P. 9(b)'s heightened standard. *See Kearns v. Ford Motor Co.*, 567

9  F.3d 1120, 1125 (9th Cir. 2009). The complaint, however, falls short of alleging the "who, what,

10  when, where, and how" required by Rule 9. *Id.* at 1124 (quotation marks omitted).

11  The complaint only describes specific communications in which Apple explained *its*

12  *rejection* of his app. *See* Compl. ¶¶ 7, 15. The complaint does not elaborate on any instances in

13  which Apple told him his app would be distributed through the App Store—the supposedly

14  "fraudulent conduct" on which he relied. Opp. 10. The complaint includes vague allegations that

15  someone at Apple represented to Plaintiff at an unidentified time, in an unidentified manner, that

16  Konverti "compli[ed] with all App Store policies." Compl. ¶ 17. This ambiguous, nonspecific

17  and general allegation does not satisfy Rule 9(b). *See Kearns*, 567 F.3d at 1127 (rejecting "claims

18  of nondisclosure . . . couched in general pleadings alleging Ford's intent to conceal from

19  customers that CPO vehicles were essentially the same as ordinary used vehicles" because "[s]uch

20  general pleadings do not satisfy the heightened pleading requirements of Rule 9(b)").

21  Similarly, Plaintiff fails to plead facts to support "the elements of fraud" as required to

22  state a claim grounded in fraud under the UCL. *Kearns*, 567 F.3d at 1126 ("The elements of a

23  cause of action for fraud in California are: "(a) misrepresentation (false representation,

24  concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e.,

25  to induce reliance; (d) justifiable reliance; and (e) resulting damage.") (citation omitted). Notably,

26  complaint lacks any allegation of scienter or an intent to defraud associated with the alleged

27  statement that Plaintiff's app complied with Apple's policies. *See id.* Nor are there any

28  allegations that, if true, would show Plaintiff justifiably relied on Apple's alleged statement. *See*

14

1  *id.* This is particularly relevant given the complaint's concession that Apple's written Guidelines

2  put the onus Plaintiff to ensure his app was safe and legal.  Compl. ¶ 16.

3         Thus, the Court dismisses Plaintiff's UCL claim (Count 5) for failure to state a claim.

4  C.    <u>Adequate Remedies at Law (Counts 1-5)</u>

5         Plaintiff's Prayer for Relief seeks exclusively equitable remedies: injunctive relief, a

6  declaration and restitution.  Compl. at 26-27.  One of the "basic requisites [for] the issuance of

7  equitable relief" from a federal court is "the inadequacy of remedies at law."  *O'Shea v. Littleton*,

8  414 U.S. 488, 502 (1974); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir.

9  2020) (a plaintiff "must establish that she lacks an adequate remedy at law before securing

10  equitable restitution for past harm"); *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996) ("It is

11  a basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving

12  party has an adequate remedy at law.").

13         Plaintiff, however, merely asserts that he lacks adequate remedies at law, Compl. ¶ 83, but

14  fails to allege facts or reasons why that is the case.  Indeed, the complaint seeks redress for

15  Plaintiff's lost investment – allegedly $150,000 that he spent developing the Konverti app – and

16  lost profits – from Apple's alleged wrongdoing by removing Konverti from the App Store.

17  Plaintiff offers the conclusory assertion that "the only way to protect its property and protect its

18  rights is to obtain an injunction," Opp. at 10; Compl. ¶¶ 85-87, but provides no explanation and

19  alleges no facts as to why a legal remedy is inadequate to remedy his alleged harm.  In *Sonner*,

20  like here, the plaintiff declined to request damages and then urged that she had no adequate

21  remedy at law and was entitled to equitable restitution.  971 F.3d at 844–45.  The Ninth Circuit

22  rejected that argument as the plaintiff had not "explain[ed] how the same amount of money for the

23  exact same harm is inadequate or incomplete."  *Id.* at 844.  Likewise, Plaintiff here could have

24  sought to recoup his lost investment through damages.  *Id.*; *see also Guzman v. Polaris Indus. Inc.*,

25  No. 8:19-cv-1543, 2021 WL 2021454, at *11 (C.D. Cal. May 12, 2021) ("The relevant question,

26  however, is not whether [plaintiff] has *pleaded* legal remedies, but whether he could have *sought*

27  an adequate legal remedy.").

28         Thus, because Plaintiff fails to adequately allege that he lacks remedies at law, Plaintiff's

United States District Court
Northern District of California

15

claims for equitable relief (Counts 1-5) are dismissed.  *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (dismissing claims because "[u]nder *Sonner*, the plaintiffs are required, at a minimum, to plead that they lack an adequate remedy at law, which they have not done").

D.      Leave to Amend

The Court dismisses all of Plaintiff's claims for the reasons discussed above, but grants Plaintiff leave to amend his claims.  Pursuant to Fed. R. Civ. P. 15(a), leave to amend "shall be freely given when justice so requires."  This complaint is Plaintiff's first.  While it appears doubtful that Plaintiff will be able to cure the fundamental flaws in his complaint, in light of the liberal policy in favor of granting leave to amend, the Court grants leave to Plaintiff to amend his claims.  *See Pistacchio*, 2021 WL 949422, at *3; *hiQ Labs*, 2020 WL 5408210, at *7 (providing leave to amend to address deficiencies in the allegations underlying the market definition). Plaintiff is cautioned, however, that in amending the complaint, he must comply with Rule of Civil Procedure 11.

## V.      CONCLUSION

The Court **GRANTS** Apple's motion to dismiss the complaint.  Docket No. 24.  The Court grants Plaintiff leave to amend his complaint.  Plaintiff amended complaint must be filed within thirty (30) days from the date of this order.

This order disposes of Docket No. 24.


**IT IS SO ORDERED**.


Dated: January 7, 2022


_____
EDWARD M. CHEN
United States District Judge